121 P.3d 1119 (2004)
2005 OK CIV APP 66
In the Matter of C.J. and D.J., alleged deprived children.
Teffin Johnson, Appellant,
v.
The State of Oklahoma, Appellee.
No. 99,459.
Court of Civil Appeals of Oklahoma, Division No. 1.
February 13, 2004.
Certiorari Denied and As Corrected September 19, 2005.
Virginia Henson, Petersen Associates, Inc., Norman, OK, for Appellant.
Jennifer E. Cox, Assistant District Attorney, Shawnee, OK, for Appellee.
Released for Publication by Order of the Court of Civil Appeals of Oklahoma, Division No. 1.

*1120 OPINION
ADAMS, Judge.
¶ 1 Teffin Johnson (Mother) appeals an order filed by the trial court, after a jury verdict, terminating her parental rights to her minor sons, C.J. and D.J. The order was based on separate jury findings that termination was in the best interest of each child due to Mother's incarceration and her failure to correct the conditions which led to the adjudication of her children as deprived. The parental rights of the father to C.J. and D.J. were also terminated by the order, but he is not a party to this appeal.
¶ 2 For reversal, Mother argues (1) she was deprived of her constitutional right to be present at all critical stages of her trial as a result of her involuntary absence during jury selection, and (2) the evidence presented by the State of Oklahoma (State) was insufficient to justify termination of her parental rights. We address Mother's constitutional argument first.
¶ 3 When reviewing a claim that the procedure used in a proceeding to terminate parental rights resulted in a denial of procedural due process, appellate courts review the issue de novo. In the Matter of A.M. & R.W., 2000 OK 82, 13 P.3d 484. It is undisputed on this record that Mother's trial counsel[1] had obtained a writ of habeas corpus to secure her presence at the jury trial, but, for unexplained reasons, the private prison did not transport her there until the second day, causing her to miss jury selection. She was present during the remainder of her trial.
¶ 4 Her trial attorney did not object to proceeding with jury selection in her absence, and she has not demonstrated how her case was prejudiced by her limited absence during those proceedings. However, Mother argues she had a right, similar to that recognized in criminal cases, to be present, and that reversal is required.
¶ 5 Jury selection is a critical stage in criminal proceedings, during which a criminal defendant has a constitutional right to be present. See Lockett v. State, 2002 OK CR 30, 53 P.3d 418. It is true that the relationship of parents to their children is a fundamental right with constitutional protection and that there are similarities between criminal and parental termination cases, however, parental termination and criminal cases are not the same. Matter of S.T.G., 1991 OK 11, 806 P.2d 636. As the criminal cases upon which Mother relies clearly explain, a criminal defendant's right to be present at a felony trial is rooted in the Confrontation Clause of the Sixth Amendment of the United States Constitution.
¶ 6 Considering an incarcerated father's argument that his involuntary absence from the entire parental rights termination proceeding violated his due process rights, the Oklahoma Supreme Court concluded "[c]ourtroom confrontation with one's civil adversary is not required either by due process *1121 or other constitutional strictures." In the Matter of Rich, 1979 OK 173, ¶ 13, 604 P.2d 1248, 1253. Mother had no absolute right to be present in these proceedings under Rich.
¶ 7 In parental rights termination matters, procedural due process requires prior notice of the proceeding and an opportunity to be heard. Tammie v. Rodriguez, 1977 OK 182, 570 P.2d 332. Jury selection is designed to ascertain whether there are grounds for a challenge for either actual or implied bias and to enable a defendant to intelligently exercise his or her peremptory challenges. Rogers v. Citizens National Bank in Okmulgee, 1962 OK 176, 373 P.2d 256. Here, Mother makes no complaint about either notice or opportunity to be heard, nor does she argue that her absence impaired her or her counsel's ability to choose an unbiased jury or prejudiced her ability to receive a fair trial. Mother has not demonstrated she was prejudiced in any way, and the trial court's judgment may not be reversed upon the grounds of Mother's absence during jury selection.
¶ 8 We now address Mother's argument that the State failed to produce sufficient evidence to support termination of her rights to C.J. and D.J. The State based its claim for termination on two separate 10 O.S.2001 § 7006-1.1(A) grounds  failure to correct the conditions which led to the children's deprived status, 10 O.S.2001 § 7006-1.1(A)(5),[2] and parental incarceration, 10 O.S.2001 § 7006-1.1(12). The latter section authorizes termination of parents rights upon "a finding that all of the following exist":
a. the child has been adjudicated deprived, and
b. custody of the child has been placed outside the home of a natural or adoptive parent, guardian or extended family member, and
c. the parent whose rights are sought to be terminated has been incarcerated, and
d. the continuation of parental rights would result in harm to the child based on consideration of the following factors, among others: the duration of incarceration and its detrimental effect on the parent/child relationship; any previous incarcerations; any history of criminal behavior, including crimes against children; the age of the child; the evidence of abuse or neglect of the child or siblings of the child by the parent; and the current relationship between the parent and the child and the manner in which the parent has exercised parental rights and duties in the past, and
e. termination of parental rights is in the best interests of the child.
Provided, that the incarceration of a parent shall not in and of itself be sufficient to deprive a parent of parental rights.
¶ 9 Where the sufficiency of the evidence is challenged on appeal, our task has been to review the evidence, without weighing it, to make certain that the State has satisfied its heavy burden and that the evidence meets that burden. We will affirm the factfinder's decision only where the record contains evidence from which the jury could reasonably have determined that the State satisfied its burden with clear and convincing evidence. In the Matter of C.R., 2003 OK CIV APP 14, 63 P.3d 573.[3]
¶ 10 Evidence concerning the first three elements of § 7006-1.1(12) is undisputed. C.J. was adjudicated deprived on October 26, *1122 2001, after his father fled the home during a drug bust and left the 2-year boy alone. C.J. was taken into custody by the Department of Human Services (DHS) and placed in a foster home. At that time, Mother was an inpatient at Drug Recovery, Inc. (DRI), which had been ordered when her 1995 deferred sentences on several drug charges[4] were accelerated after she failed to attend required meetings and a random urinalysis. Mother stipulated to C.J.'s deprived status, and in December 2001, she was given physical custody of C.J.
¶ 11 In June of 2002, three weeks after D.J.'s birth, Mother left C.J. in her car in the parking lot behind the Pottawatomie County Courthouse and took D.J. with her while attempting unsuccessfully to sneak a hacksaw and marijuana into the county jail where the minors' father was incarcerated awaiting trial on drug-related felony charges. Mother was arrested, and both children were returned to the physical custody of DHS and placed with the same foster family with whom C.J. had previously been placed. D.J. was adjudicated deprived on July 19, 2002, and on September 25, 2002, Mother was incarcerated after pleading nolo contendre to two felony charges,[5] for each of which she was sentenced to two years in the custody of the Department of Corrections, with the sentences to run concurrently.
¶ 12 Contending there was undisputed testimony "that she was to be released less than a year after her initial incarceration," Mother argues that her "short incarceration" is not the type of incarceration contemplated by § 7006-1.1(12)(c). We do not agree with either Mother's analysis of this section or her characterization of the evidence.
¶ 13 In 1997, the Legislature amended the text now in § 7006-1.1(A)(12)(c), formerly at 10 O.S.Supp.1997 § 7006-1.1(A)(8)(c), by deleting the emphasized portion of the following phrase, "the parent whose rights are sought to be terminated has been sentenced to a period of incarceration of not less than ten (10) years" and adding "incarcerated" at the end. Where a former statute is clear or its meaning has been judicially determined, the Legislature's amendment of it may reasonably indicate legislative intent to alter the law. Bruner v. Sobel, 1998 OK 60, 961 P.2d 815. Based thereon, we conclude the Legislature intended to eliminate any minimum period for a parent's incarceration before the State could move on that independent basis for termination.
¶ 14 However, the Legislature has continued to recognize "the duration of incarceration and its detrimental effect of the parent/child relationship," as one of several factors in a non-exclusive list that a factfinder may consider when determining the fourth element of § 7006-1.1(12), whether "the continuation of parental rights would result in harm to the child." See 10 O.S.2001 § 7006-1.1(12)(d). When we consider these two subsections together, the Legislature's intent is clear  if the State provides clear and convincing evidence from which a factfinder finds that even a short period of incarceration has a detrimental effect on the children, that factor in conjunction with other *1123 factors may support termination of parental rights.
¶ 15 Concerning the duration of Mother's incarceration, the jury heard testimony that there was no guarantee Mother would be paroled one month after the hearing or any time earlier than her scheduled release date, September 25, 2004, which at the time of trial, left approximately sixteen months incarceration.
¶ 16 The jury also heard undisputed testimony about the potential for revocation of Mother's 1998 five-year suspended sentence for violating the terms of the rules and conditions for probation on her prior convictions.[6] Contrary to Mother's argument, the evidence did not demonstrate that Mother would be released from incarceration soon.
¶ 17 Relating to the detrimental effect of Mother's incarceration on the children, the jury heard the foster mother of C.J. and D.J., who at the time of Mother's trial were 3 and 1 years old, respectively, describe what had happened when she took the children to visit Mother at the prison  they were locked between two gates until time to check her identification and then she and both children were "patted down," which, in D.J.'s case, always caused him to cry because a stranger took him to check his diaper. Further, the DHS caseworker testified that, in her opinion, visitation at the prison was bad for the children and not a positive experience, because the only thing they would remember is "all the trauma, . . . the strip searches, being treated like they're themselves a criminal." She also testified that Mother's incarceration until September 25, 2004, would have a "horrible" effect on C.J. and D.J., explaining "the only family they know is the family that's raised them, that cared for them, kept them safe, provided for their needs, and then they're taken away from that." When asked if the ages of C.J. and D.J. made a difference, the caseworker answered "[y]es," immediately explaining that "all the studies on children indicate that up till they're five years old is their formative years. It's like you're baking a cake, and you're putting in each ingredient. If you leave out an ingredient, the cake isn't going to be what it could have been. And these children are under five." In addition to the detrimental effect of the duration of Mother's incarceration, past and future, this same evidence also relates to § 7006-1.1(12)(d)'s factors  any history of criminal behavior and the age of the children.
¶ 18 Another § 7006-1.1(12)(d) factor that a factfinder may consider in determining whether the continuation of parental rights would result in harm to the children is "the current relationship between the parent and the child[ren]." Although disputed by Mother, the jury heard the foster mother testify that during the visits, there "was more and more dependency on me and less and less her bonding with her children." She further explained that "the visit would be about [Mother's] stress" and that "she wasn't holding [the children]. She wasn't playing with them." The foster mother testified that whenever Mother called or wrote letters, Mother rarely inquired how the children were doing. The foster mother further testified that when she brought C.J. and D.J. into Mother's termination hearing and to visit her in prison, the children did not respond to Mother and that they did not cry when visitations ended.
¶ 19 The jury also heard testimony regarding another § 7006-1.1(12)(d) factor, i.e., "the manner in which the parent has exercised parental rights and duties in the past." The DHS caseworker testified that Mother "never totally got" that by leaving C.J. in the car with the windows rolled down and taking three-week old D.J. with her when attempting to sneak the hacksaw and marijuana into the county jail, she had put their lives in jeopardy. Mother testified that she "signed [her] guardianship" of her two older daughters to her family, that she had not seen her daughters for seven years, but that now she was focusing on her two sons. During cross examination, Mother admitted to losing her daughters because of her drug and alcohol problems, and despite that loss, she had not been able to overcome her addiction to methamphetamine, which she had had since her teenage years.
*1124 ¶ 20 There is also clear and convincing evidence concerning the fifth element of § 7006-1.1(12), termination of parental rights is in the best interest of the child. D.J. has been with the same foster parents since he was three weeks old, and C.J. and D.J. have both bonded with this foster family, which is composed of two adults, and other children aged 18,10, 9, 6, and 5. The DHS caseworker testified that D.J. did not even know who his real mother was, that C.J. and D.J. need permanency in their lives, and that the foster parents had expressed a desire to adopt them. Moreover, the State presented evidence that the children's natural father had executed a Limited Consent to Adoption, which expressly consented only to the current foster parents adopting C.J. and D.J.
¶ 21 The State sustained its burden of proving by clear and convincing evidence the existence of all of the elements contained in § 7006-1.1(12). As a result, we need not review the remaining basis for the jury's verdict in favor of terminating Mother's parental rights. The trial court's judgment is affirmed.
AFFIRMED
JONES, J., and BUETTNER, V.C.J./P.J., concur.
NOTES
[1] Mother's attorney on this appeal did not represent her in the trial court.
[2] Title 10 § 7006-1.1(A)(5) provides:

A finding that:
a. the child has been adjudicated to be deprived, and
b. such condition is caused by or contributed to by acts or omissions of the parent, and
c. termination of parental rights is in the best interests of the child, and
d. the parent has failed to show that the condition which led to the adjudication of a child deprived has been corrected although the parent has been given not less than the time specified by Section 7003-5.5 of this title to correct the condition.
[3] This case recognized that the precise nature of the application of the appellate standard of review is open to question under the Oklahoma Supreme Court's rejection of the "any competent evidence" standard in Matter of S.B.C., 2002 OK 83, 64 P.3d 1080. Even if we are required to sit as a "collective `seventh juror,'" C.R., 2003 OK CIV APP 14, ¶ 9, 63 P.3d at 575, we would reach the same conclusion.
[4] Mother pled guilty in December of 1995 to controlled drug and firearm felonies and was given a five-year deferred sentence. According to the Acceleration of Deferred Sentence Judgment and Sentence, filed in Oklahoma District Court on January 11, 1999, the deferred charges in No. CF-95-3407 were accelerated, and at a hearing held November 6, 1998, Mother was sentenced to 5 years imprisonment for the deferred charges except a charge of possession of drug paraphernalia, for which she received 1 year. In addition, each term of imprisonment was suspended, under the supervision of the Department of Corrections, "to be served concurrently with each other and with CF-98-1976." According to the Judgment and Sentence filed in the latter case on January 20, 1999, Mother pled guilty to new charges, Possession of Controlled Dangerous Substance and Possession of Paraphernalia, on the same date as her deferred sentence was accelerated, November 6, 1998. Because she had previously been convicted of a felony, her sentence was enhanced pursuant to "21 O.S. 51," she was sentenced to 5 years and 1 year imprisonment, respectively, and both terms were suspended and to run "concurrently with Case No. CF-95-3407."
[5] Conspiracy to Escape from County Jail While Awaiting Trial on a Felony Charge and Conspiracy to Bring Controlled Dangerous Drug into County Jail for Prisoner.
[6] See footnote 3 for the precise convictions. Mother's two felony convictions, for which she was incarcerated, occurred during her five year suspended sentence given in No. CF-98-1976.